Gerald Singleton (SBN 208783)
Brody A. McBride (SBN 270852)
Trenton G. Lamere (SBN 272760)
SINGLETON LAW FIRM, APC
450 A Street, 5th Floor
San Diego, California 92101
Tel:    (619) 697-1330
Fax:    (619) 697-1329
Gerald@SLFfirm.com
Brody@SLFfirm.com
Trenton@SLFfirm.com

Adam Hepburn (SBN 292736)
Michael P. Hernandez (SBN 292679)
Elliot Jung (SBN 285491)
HEPBURN, HERNANDEZ, & JUNG
TRIAL ATTORNEYS
945 4th Avenue, Suite 201
San Diego, California 92101
Tel:    (888) 505-2934
Fax:    (877) 808-8348
MHernandez@HHJTrialAttorneys.com
AHepburn@HHJTrialAttorneys.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT OF CALIFORNIA

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA PALACIOS, individually and as successor in interest to her deceased son, Ivan Ortiz,<br><br>          Plaintiff,<br><br>          v.<br><br>COUNTY OF SAN DIEGO; WILLIAM GORE; ERIKA FRIERSON; SAN DIEGO COUNTY SHERIFF'S DEPARTMENT CHIEF MEDICAL OFFICER; BARBARA ANN V. LEE; ROSA PATRON; and CURRENTLY UNKNOWN SAN DIEGO COUNTY SHERIFF'S DEPARTMENT PERSONNEL,<br><br>          Defendants. | Case No.  **'20 CV0450 MMABGS**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

/ / /

/ / /

/ / /

1

COMPLAINT

## I.     INTRODUCTION

1.     In March 2019, Ivan Ortiz ("Ivan") was a pretrial detainee in the San Diego County Central Jail.  Because jail staff knew Ivan had a history of mental illness and suicide attempts, he was being held in the jail's Psychiatric Stabilization Unit ("PSU").

2.     While in the PSU on the morning of March 18, 2019, jail staff discovered Ivan had tried to strangle himself with a noose made from a towel.  Ivan told jail staff he was "feeling sad and depressed" and felt like "ending his life."  Ivan told jail staff he was hearing voices telling him to hurt and kill himself.

3.     Jail staff moved Ivan to a single-person observation cell within the PSU, equipped with video cameras that allowed for continuous monitoring.

4.     At some point, Ivan was given food—in a plastic bag.

5.     Jail staff claim they then checked on Ivan later that afternoon, at 2:55 p.m. Jail staff then left Ivan alone, unmonitored, until at least 3:40 p.m.

6.     During those *forty-five minutes*, Ivan took the plastic bag he had been given, got into bed, and covered himself with a sheet.  He pulled the plastic bag over his face. And he left it there until he suffocated.

7.     When Ivan's mother, Plaintiff Maria Palacios, heard that her son was in trouble (through a doctor or nurse at UCSD Medical Center), jail staff stonewalled Ms. Palacios.  Fully aware her son was dying or dead, jail staff treated Ms. Palacios with coldhearted contempt, refusing to allow her to see, or even know anything about, her son after he was transported to the hospital.  Ivan was pronounced dead at the hospital, unaccompanied by a single family member or friend.

8.     Ms. Palacios now sues the County of San Diego and San Diego County Sheriff's Department's policymakers and personnel for damages, pursuant to 42 U.S.C. § 1983 and various other federal and state laws.

## II.     JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, as Plaintiff asserts causes of action arising under 42

2

COMPLAINT

U.S.C. §§ 1983 and 12101 et seq., and 29 U.S.C. § 749a, in addition to California causes of action that arise from the same controversy giving rise to Plaintiff's federal claims.

10.     The Court has personal jurisdiction over all Defendants in this action, as all Defendants are and were, at all times relevant to this complaint, situated, regularly conduct business, and/or are and were domiciled in the State of California.

11.     Venue is proper in this district, as the events giving rise to this action occurred in the County of San Diego, California, which is located within the Southern District of California.

### III.   PARTIES

12.     Plaintiff Maria Palacios ("Plaintiff" or "Ms. Palacios") is and was, at all times relevant to this complaint, an individual domiciled in California.  Maria was decedent Ivan Ortiz's mother.  In addition to suing individually for damages arising from Ivan's death, Maria sues as Ivan's sole successor in interest to prosecute those claims which survived Ivan's death.  *See* Cal. Civ. Proc. Code § 377.30.

13.     Defendant County of San Diego ("County") is and was, at all times relevant to this complaint, a municipal entity duly organized under California law.  The San Diego County Sheriff's Department ("Department") is the chief law enforcement agency for the County.  The Department manages and operates the San Diego Central Jail ("Central Jail") and was, at all times relevant to this complaint, responsible for the policies, procedures, practices, and customs of the Central Jail, as well as for the hiring, training, supervision, discipline, actions, and inactions of the County's agents and/or employees working in the Central Jail.

14.     Defendant William Gore ("Gore") is and was, at all times relevant to this complaint, an individual and the San Diego County Sheriff, the highest position in the Department.  Gore was, at all times relevant to this complaint, ultimately responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Department personnel, including all detention officers and medical staff in the Central Jail.  Gore is and was, at all times relevant to this complaint, a final policymaker

3

for the County and Department, responsible for the County's and Department's policies, procedures, practices, and customs pertaining to the County jails, detentions, and the provision of adequate medical services (including mental-health services) to those in County custody.

15. Defendant Erika Frierson ("Frierson") is and was, at all times relevant to this complaint, an individual and a Department Commander, responsible for overseeing the Medical Services Division of the Department's detention operations. Frierson is and was, at all times relevant to this complaint, a final policymaker for the County and Department, responsible for the County's and Department's policies, procedures, practices, and customs pertaining to the County jails, detentions, and the provision of adequate medical services (including mental-health services) to those in County custody. Frierson is sued in her individual and official capacities.

16. Defendant San Diego County Sheriff Chief Medical Officer ("Chief Medical Officer") is and was, at all times relevant to this complaint, an individual and the Department's Chief Medical Officer, responsible for overseeing the Medical Services Division of the Department's detention operations. Chief Medical Officer is and was, at all times relevant to this complaint, a final policymaker for the County and Department, responsible for the County's and Department's policies, procedures, practices, and customs pertaining to the County jails, detentions, and the provision of adequate medical services (including mental-health services) to those in County custody. The true name of Chief Medical Officer is currently unknown to Plaintiff. If/when Plaintiff learns Chief Medical Officer's identity, Plaintiff will seek leave to amend this pleading accordingly. Chief Medical Officer is sued in his/her individual and official capacities.

17. Defendant Barbara Ann V. Lee ("Lee") is and was, at all times relevant to this complaint, an individual and the Department's Medical Services Administrator, responsible for overseeing the Medical Services Division of the Department's detention operations. Lee is and was, at all times relevant to this complaint, a final policymaker for the County and Department, responsible for the County's and Department's policies,

4

procedures, practices, and customs pertaining to the County jails, detentions, and the provision of adequate medical services (including mental-health services) to those in County custody.  Lee is sued in her official and individual capacities.

18.     Defendant Rosa Patron ("Patron") is and was, at all times relevant to this complaint, an individual working as for the Department as a law-enforcement officer.

19.     Defendants Currently Unknown San Diego Sherriff's Department Personnel ("Currently Unknown Department Personnel") are individuals whose identities, titles, employment/agency relationships are currently unknown to Plaintiff.  These unknown individuals include jail staff, detention officers, medical staff, medical providers, supervisors, employees, agents, contractors, and final policymakers who substantially contributed to the acts and omissions giving rise to the damages claimed herein.

20.     Defendants each acted under color of state law, within the scope of their agency and/or employment, and with the full knowledge and consent, either express or implied, of his or her principal and/or employer.

## IV.   CALIFORNIA GOVERNMENT CLAIMS REQUIREMENTS

21.     Plaintiff has complied with the state-law requirements to assert the state-law causes of action alleged in this complaint, including those set forth in California Government Code sections 900 et seq.

## V.   FACTS

### A.   Jail Staff's Deliberate Indifference to Serious Medical Risks and Needs

22.     From June 9, 2018, through March 18, 2019, Ivan was a pretrial detainee in County custody at Central Jail.

23.     County records show, and jail staff actually knew—on March 18, 2019—that Ivan had been diagnosed with schizophrenia and had a history of suicidality.  In fact, prior to March 18, 2019, Ivan had at least one documented suicide attempt while in County custody at Central Jail.  Thus, on March 18, 2019, Ivan was being held in Central Jail's Psychiatric Stabilization Unit ("PSU").

24.     On the morning of March 18, 2019, jail staff found Ivan sitting in his PSU

5

cell with a mark around this neck indicating he had just tried to strangle himself. Jail staff then found a noose made from a towel in Ivan's cell. Ivan told jail staff he was "feeling sad and depressed," and he felt like "ending his life." He told jail staff he was hearing voices telling him to hurt and/or kill himself.

25.    Ivan was moved to a single-person observation cell within the PSU that was equipped with video cameras that allowed jail staff to continuously monitor the cell.

26.    At some point, after Ivan was transferred to the single-person observation cell, a currently unknown Department deputy, employee, and/or agent gave Ivan food in a plastic bag.

27.    Jail staff claim they then observed Ivan at 2:55 p.m. without issue. Jail staff did not then check on Ivan again until 3:40 p.m. During those forty-five minutes, Ivan suffocated himself.

28.    Ivan can be seen on the recorded video footage getting the plastic bag, getting into bed, pulling the sheet over his head, and putting the plastic bag over his face until he suffocated.

29.    When jail staff finally checked on Ivan, he was unconscious or dead. 9-1-1 was called, and Ivan was transported to UCSD Medical Center. Ivan did not arrive at UCSD Medical Center until about 4:30 p.m.

30.    Medical staff at UCSD Medical Center were able to restore Ivan's heartbeat, but he had been deprived of oxygen for too long. Ivan was pronounced dead at 8:27 p.m.

**B.    Jail Staff's Intentional Infliction of Emotional Distress**

31.    At no point did jail staff attempt to contact Ms. Palacios to inform her of Ivan's medical emergency. Rather, Ms. Palacios heard the news from a doctor or nurse at UCSD Medical Center who called Ms. Palacios.

32.    As soon as she got the news, Ms. Palacios went to UCSD Medical Center with her daughter. Ms. Palacios raced around the hospital desperately trying to find her son.

33.    As Ivan's condition continued to deteriorate, a doctor or nurse went to meet

6

COMPLAINT

Ivan's family.  They attempted to take Ms. Palacios and her daughter to see Ivan before he died.

34.    A currently unknown Department deputy, employee, and/or agent outside Ivan's room stopped Ms. Palacios and her daughter cold—preventing them from seeing Ivan one last time before he died.

35.    At this point desperate, Ms. Palacios drove to Central Jail to talk to someone about getting permission to see Ivan at the hospital.  She waited over an hour and a half before anyone even addressed her.

36.    Eventually, a currently unknown Department deputy, employee, and/or agent finally approached Ms. Palacios to rudely inform her she did not need to keep waiting for a permit to see her son, because she would not be able to see him at all.  Ivan was dead.

37.    Ms. Palacios and her daughter then returned to the hospital where they were confronted by Patron, a Department detective.

38.    Fully aware of Ms. Palacios' grief, Patron proceeded to rudely interrogate Ms. Palacios and her daughter, causing Ms. Palacios severe emotional distress.

C.    **County's and Department's Deliberate Indifference to Risk of Suicides in County Jails**

   i.    **National Commission on Correctional Health Care's Findings and Recommendations**

39.    The National Commission on Correctional Health Care ("NCCHC") sets standards for health services in correctional facilities, operates an accreditation program for institutions that meet those standards, produces resource publications, conducts educational conferences, and offers certification to correctional health professionals.

40.    On November 8, 2016, the Department contracted with NCCHC for assistance regarding compliance with the NCCHC standards for in County jails.

41.    In January 2017, the NCCHC provided a report to the Department after reviewing the practices of County jails.  Of the thirty-eight "essential standards"—all of which must be met in order to attain accreditation—the Central Jail failed to meet twenty-

COMPLAINT

six standards.

42.    NCCHC found–among other things–County jails failed to review inmates' deaths in a timely manner, healthcare providers were not being informed of any results of death reviews, and there was no formal peer-review process for contract medical providers or for nurses.

43.    NCCHC found the inmate grievances were hard to track, and it was difficult to count and sort the number of medical grievances.

44.    NCCHC found there was no central log to track correctional officers' training requirements on health-related matters.

45.    According to NCCHC, a standard on chronic disease services is required to ensure that an inmate/patient suffering from one of nine chronic conditions is identified and enrolled in a chronic disease program based on national clinical protocols.  The nine chronic conditions include "major mental illness."  The County medical providers interviewed by NCCHC stated they were unaware of *any* chronic disease protocols.

46.    NCCHC recommended a responsible physician oversee the development of protocols for all nine chronic diseases identified in the standard.

47.    NCCHC recommended a new policy and procedure be implemented, and a new form be used, for providers to better document chronic diseases.

48.    NCCHC advised that a central list of chronic-disease patients be available to ensure everyone is treated according to their disease status.

49.    NCCHC recommended sufficient and suitable space, supplies, and equipment be available for the Department's medical, dental, and mental-health services.

50.    NCCHC advised suicides may be prevented by implementing prevention efforts and interventions.

51.    The County, Gore, Frierson, Chief Medical Officer, Lee, and/or currently unknown policymakers for the County and the Department on the issue of medical services, knew of and failed to implement the foregoing recommendations, thus substantially contributing to Ivan's death.

COMPLAINT

### ii.     Disability Rights California's Findings and Recommendations

52.     Disability Rights California ("DRC") is a nonprofit agency and the largest disability rights group in the nation.  DRC is established under federal law to protect and advocate for the rights of people with disabilities.

53.     In 2015, DRC opened an investigation into conditions at County jails.

54.     In April of 2018, DRC published its finding: "Suicides in San Diego County Jail: A System Failing People with Mental Illness" ("DRC Report").

55.     DRC found "an extremely high number of jail inmates with significant mental health treatment needs."

56.     DRC found "significant deficiencies in County's suicide prevention practices."

57.     DRC found the "County's jail system subjects inmates with mental health needs to a grave risk of psychological and other harms by failing to provide adequate mental health treatment."

58.     DRC found "the existing systems of jail oversight have failed" to properly monitor jail conditions, implement suicide-prevention practices, and provide adequate mental-health treatment practices.

59.     DRC experts identified twenty-four "Key Deficiencies" and provided forty-six recommendations to address deficiencies in the County's suicide-prevention and related mental-health treatment delivery efforts.

60.     DRC provided nine components a correctional suicide prevention program to be effective, including but not limited to: "Supervision of At-Risk Inmates" and "Suicide Prevention Training."

61.     The County, Gore, Frierson, Chief Medical Officer, Lee, and/or currently unknown policymakers for the County and the Department on the issue of medical services, knew of and failed to implement the foregoing recommendations, thus substantially contributing to Ivan's death.

/ / /

9

COMPLAINT

iii.     **National Center on Institutions and Alternatives' Findings and Recommendations**

62.     Following the DRC Report, Lindsay Hayes, a project director with the National Center on Institutions and Alternatives, assessed the suicide-prevention practices within County jails.  His report, "Report on Suicide Prevention Practices within the San Diego County Jail System" ("Hayes' Report"), was released in June 2018.

63.     Hayes' Report focused on eight critical components of a suicide prevention policy which include staff training, identification/screening, communication, housing, levels of supervision/management, intervention, reporting, and follow-up/mortality-morbidity review.  Based on his on-site assessment, as well as a review of various Department policies and procedures related to suicide prevention, Hayes found several policies inadequate to prevent suicide.

64.     Hayes found "[t]he suicide prevention training requirements . . . are vague." Hayes found that, in 2017, only 31% of deputies and only 73% of medical personnel had received annual suicide prevention training.

65.     Hayes found "the conditions for suicidal inmates placed in safety cells and Enhanced Observation Housing ("EOH") cells were harsher than for those on segregation status," and that the safety cells are "generally overly restrictive, and seemingly punitive." Hayes further stated that confining a suicidal inmate to his/her cell twenty-four hours a day only enhances isolation and is anti-therapeutic.

66.     Hayes found "various suicide prevention policies provide limited guidance regarding the observation of suicidal inmates, simply stating that custody personnel are required to provide direct visual observation of suicidal inmates 'at least twice in every thirty (30) minute period.'"  Hayes found there was "*no* option in any [Department] policy for constant and continuous observation of inmates at the highest risk for suicide."

67.     Hayes' Report set forth thirty-two actionable recommendations.

68.     Hayes "strongly recommended that the [suicide prevention] policy be revised to include a more robust description of the requirements for both pre-service and annual

10

COMPLAINT

suicide prevention training, to include the duration of each workshop and an overview of the required topics."

69.   Hayes "strongly recommended that possessions and privileges provided to inmates on suicide precautions should be individualized and commensurate with their level of risk."

70.   Hayes "strongly recommended that all . . . suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation."  Additionally, "consistent with the standard of care, an inmate identified as potentially suicidal (or placed on suicide precautions after hours by non-mental health personnel) should be immediately referred to a mental health clinician for completion of a suicide risk assessment."

71.   Hayes strongly recommended "officials conduct a comprehensive physical plant review of all jail cells utilized for the housing of suicidal inmates to ensure that they are reasonably suicide-resistant."

72.   The County, Gore, Frierson, Chief Medical Officer, Lee, and/or currently unknown policymakers for the County and the Department on the issue of medical services, knew of and failed to implement the foregoing recommendations, thus substantially contributing to Ivan's death.

**D.   County's and Department's *de Facto* Customs and Practices Resulting in Preventable Suicides in County Jails**

73.   At the time of Ivan's death, there had been—in addition to the deliberate indifference described in the foregoing paragraphs—long-standing *de facto* customs and practices of improperly and inadequately investigating jail deaths; covering up misconduct resulting in jail deaths; and failing to discipline and train deputies and medical staff.

74.   The 2015/2016 San Diego County Grand Jury ("Grand Jury") took issue with the Jail Information Management System ("JIMS"), a database used for maintaining inmate records.  Jail Staff reported having trouble sorting and retrieving information from the eleven-year old software.  The lack of an accessible, central database contributes to

COMPLAINT

1    improper and inadequate investigations and cover-ups.

2        75.    The 2016/2017 San Diego County Grand Jury took issue with suicides in jails

3    in San Diego.  The Grand Jury found lacking "[a] continuous oversight of the suicide-

4    prevention plan . . . to ensure that the suicide-prevention plan, the Policy and Procedures

5    Manual ("P&PM"), and the facilities' physical features are kept current with suicide

6    methods used by the inmates."

7        76.    The 2018/2019 San Diego Grand Jury also focused on mental-health issues

8    in County jails, including the high rate of suicides.  The Grand Jury found (i) suicide is a

9    leading cause of death among inmates in local jails in the United States; (ii) San Diego

10   County jails have seen more than 120 deaths since 2007, including 30 suicides; and (iii)

11   County jails have been criticized many times over the past decade for their high suicide

12   rates.

13       77.    The County, Gore, Frierson, Chief Medical Officer, Lee, and/or currently

14   unknown policymakers for the County and the Department were, moreover, aware of the

15   following examples that resulted from a <u>failure to coordinate and share critical medical</u>

16   <u>information among personnel</u>:

17           a.  The 2008 suicide of Adrian Correa, a 21-year-old paranoid schizophrenic

18               who had threatened to kill himself multiple times.  The County's Citizens'

19               Law Enforcement Review Board ("CLERB") expressed concern about a

20               breakdown in communication during shift changes, stating: "A checklist

21               that includes the status of at-risk inmates and the Department's response

22               plan would enhance continuity of care, monitoring and housing."  (The

23               County and the Department rejected this recommendation.)

24           b.  On June 25, 2011, Daniel Sisson died from an acute asthma attack made

25               worse by drug withdrawal.  He lay dead for several hours before a fellow

26               inmate found him.  Due to lack of communication between jail staff, jail

27               staff had failed to monitor him.

28           c.  In September 2012, Bernard Victorianne suffered for five days from drug

12

COMPLAINT

overdose because the staff ignored available (yet unshared) medical information that he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose. Mr. Victorianne was placed in segregation instead of in a medical unit. He was eventually found dead face-down, naked in his cell. Jail staff had failed to input critical medical information into the JIMS system. And Jail staff had failed to communicate with each other regarding Mr. Victorianne's medical alerts.

d.  In 2014, former U.S. Marine Kristopher NeSmith committed suicide after the jail staff failed to treat Mr. NeSmith for his significant and known mental illness and a history of suicide attempts. When Mr. NeSmith was last seen alive about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety throughout the detention center. The deputy, without breaking stride, said something to the effect of, "NeSmith, what are you trying to do? Kill yourself? Take that thing down." The deputy then failed to communicate this information to other jail staff or to call for psychiatric intervention. No other jail staff took any further action. Mr. NeSmith was later found dead, having hung himself.

e.  In 2014, Ronnie Sandoval died in the Jail from drug overdose. Showing obvious symptoms of overdose, the nursing staff did not summon help or treat him for overdose. Nor did the nurses pass on information regarding Mr. Sandoval's condition during the shift change. Mr. Sandoval died from drug intoxication.

f.  In 2015, Ruben Nunez, a schizophrenic patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication. The jail medical providers treating Mr. Nunez failed to read his medical records and failed to input critical medical information into JIMS. One of the psychiatrists testified she did

13

COMPLAINT

not know how to use JIMS to add "alerts," meaning the most critical information regarding a patient's care.  She testified she was never trained to do this.

g.  In 2016, Heron Moriarty was arrested after having a psychotic break. Despite multiple warnings by family members, including twenty-eight telephone calls by his wife, jail staff failed to communicate his condition to other jail staff and failed to provide him psychiatric care.  On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself.

h.  In 2016, Jason Nishimoto killed himself with a bedsheet on his fourth night in a County jail, the evening before he was scheduled to see a psychiatrist.  His psychiatric condition was well known to the jail staff, who ignored it.

i.  In 2018, at least four suicides occurred in the Central Jail.  Most notably, on October 8, 2018, an inmate killed himself the same day he was booked into Central Jail.  He reportedly used food to suffocate himself while he was being housed in a unit designed for suicidal inmates.

78.  The County, Gore, Frierson, Chief Medical Officer, Lee, and/or currently unknown policymakers for the County and the Department were aware of a long history of their subordinates <u>failing to conduct proper cell checks</u>, including the following examples:

a.  In the case of Mr. Sisson's death in 2011, jail staff failed to check on Mr. Sisson for hours.  Mr. Sisson died during drug withdrawal.

b.  In 2012, as Mr. Victorianne lay on his cell floor, naked and unconscious, none of the deputies conducted proper security check, soft counts, or hard counts.  One deputy was told by an inmate that Mr. Victorianne was not breathing.  This deputy kicked Mr. Victorianne, stated Mr. Victorianne "twitched," and left him to die in his cell.

c.  In 2014, Christopher Carroll, who was severely mentally ill, was placed

14

COMPLAINT

in segregation.  While unobserved, Mr. Carroll had smeared blood on the wall of his cell, urinated on the floor, and threw food and feces on the ceiling before hanging himself.  Jail staff failed to conduct proper cell checks despite knowing about Mr. Carroll's condition.

d.  In Mr. Nunez's case, a deputy saw Mr. Nunez in his cell sitting in his own vomit and urine.  Despite seeing Mr. Nunez twice in this condition, this deputy failed to summon help or take Mr. Nunez to medical services.  The deputy left Mr. Nunez in his cell to die.

e.  In Mr. NeSmith's case in 2014, a jail deputy saw Mr. NeSmith attempting suicide, but took no action to stop Mr. NeSmith or to call for psychiatric intervention.

f.  In February of 2016, Richard Boulanger hung himself in his cell.  His cellmate pressed the emergency all button, but no deputy came to the cell for approximately 20 minutes.  A subsequent investigation revealed that one of the deputies did not break stride or look into Mr. Boulanger's cell during a cell check.  The investigation revealed that during cell checks, the deputy peered into each cell for approximately once second in violation of policy.  The investigation further revealed a practice in which the deputies were turning off the sound of the emergency call buttons, lowering the volume, or muting the inmate intercom system so that no sound could be heard.  Call buttons in many of the housing units did not function, which made no sound when pressed.  The audio for the monitor in the jail tower did not function well so that it was difficult to hear tones and sounds from the monitor even when the volume was turned to the maximum level.

g.  In addition to these specific cases in which the County, Gore, Frierson, Chief Medical Officer, Lee, and currently unknown policymakers for the County and the Department were placed on notice, jail staff had

15

COMPLAINT

themselves notified the County that they were not conducting proper cell checks and that glancing into a cell without breaking stride was routine

79.   The County, Gore, Frierson, Chief Medical Officer, Lee, and/or currently unknown policymakers for the County and the Department have a long history of <u>failing to investigate misconduct, take appropriate remedial action, and covering up wrongdoing</u>, including the following examples:

a. In the case of Mr. Victorianne, the supervisors covered up wrongdoing by interfering with the investigation by preventing homicide investigators from interviewing the last deputies to see Mr. Victorianne alive.  After his own staff issued a recommendation that certain staff members be reprimanded for lying, Gore refused to follow it.

b. When Mr. NeSmith's widow sued the County over his death, she cited to the San Diego CityBeat article titled "60 Dead Inmates" by Kelly Davis, an award-winning journalist who exposed the problem of the high death rates in County jails.  County officials then targeted Davis, subpoenaing her to divulge all the information and sources she used for her story, including confidential discussions with attorneys about the wrongful death lawsuits.  The County then filed a motion to compel.  Instead of addressing the known problems in County jails, County officials targeted this journalist with the intent to silence any criticism and public attention.

c. After the deaths of Mr. Nishimoto, Mr. Nunez, and Mr. Moriarty, Defendant Lee and Dr. Alfred Joshua (former San Diego Sheriff's Chief Medical Officer) agreed with the County's private mental-health contractor, Correctional Physicians Medical Group ("CPMG"), that they would make documents "non-discoverable" during litigation. The County, Lee, and Dr. Joshua withheld critical evidence from the families of these decedents in order to keep the misconduct of the CPMG psychiatrists a secret.

COMPLAINT

d.  The County's investigative body, CLERB, which has the responsibility to investigate all in-custody deaths and deputy misconduct, is underfunded and understaffed.

e.  Those sitting on the actual board are volunteers, who are not required to have previous special training or experience in investigations, or any other relevant topics related to jail operations, Constitutional requirements, or law.

f.  CLERB does not control its own budget.  It cannot hire investigative staff itself, even when required to complete its work.  It does not have any subpoena authority.

g.  CLERB has never inspected a single jail facility in the 25 years of its existence.

h.  By October of 2017, CLERB had fifty-nine open in-custody death investigations, including a death going back six years.

i.  On November 11, 2017, CLERB announced it was summarily dismissing twenty-two death cases *without review* based on a one-year time limitation for imposing officer discipline, which is imposed by the County despite the fact that CLERB has publicly stated that "death cases and other complex investigations often take more than one year to complete."

j.  This problem was caused by a patter in which County jail officials would not report in-custody deaths to CLERB for months or nearly a year.

k.  As a result of the understaffing and underfunding of CLERB and the delay in reporting, it is not able to meaningfully investigate misconduct of deputies before the expiration of the one-year statute of limitations. Deputies thus continue to engage in misconduct with impunity, including the failure to render medical care, to conduct proper cell checks, to communicate/input vital information regarding detainees.

l.  The failure to institute a working independent process for investigating

17

COMPLAINT

deputy misconduct has led to a culture where egregious violations of policies leads to no discipline. As a result, deputies continue to violate the Jail's policies and procedures with respect to conducting proper cell checks.

m. When it comes to medical personnel within the County jails, there is no independent review by any outside individual, board, or agency—even when the misconduct or negligence leads to serious injury or death.

**E.    Ivan's Wrongful Death**

80.    Defendant's deliberately indifferent, intentional, reckless, and/or negligent conduct toward Ivan's health, safety, and welfare actually and proximately resulted in Ivan's avoidable suicide:

a. Jail staff failed to appropriately and safely respond to and deal with Ivan, an individual under their care and custody who they knew was suffering from schizophrenia and was actively suicidal by, among other things, providing him with prompt access to a mental-health provider, diligently monitoring him, and ensuring he did not have access to a means to attempt suicide;

b. The County and Department failed to provide the necessary resources and to adequately train their jail staff (both corrections and medical) to appropriately and safely respond to and deal with situations involving mentally ill and suicidal individuals;

c. Jail staff failed to provide reasonable accommodations to Ivan in light of a known and/or perceived disability;

d. The County, Gore, Frierson, Chief Medical Officer, Lee, and/or currently unknown supervisors for the County and the Department negligently hired, retained, controlled, and/or supervised the jail staff (both corrections and medical) who substantially contributed to Ivan's death;

81.    As an actual and proximate result of Defendants' tortious, as alleged herein,

18

Ivan suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial.  Ms. Palacios, moreover, suffered damages arising from Ivan's wrongful death and the conscience-shocking deprivation of her parent-child relationship with Ivan.

## VI.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs**

**(By Ivan's Successor in Interest Against Currently Unknown Department Personnel)**

82.   All prior paragraphs are incorporated herein by this reference.

83.   Ms. Palacios asserts this cause of action as Ivan's successor in interest.

84.   On March 18, 2020, Ivan was a pretrial detainee in Defendants' custody.

85.   At all times relevant to this cause of action, Defendants were acting under color of state law.

86.   On March 18, 2020, Defendants subjectively knew (or, objectively, should have known) that Ivan faced serious medical risks and had serious medical needs, including being actively suicidal.

87.   Despite this knowledge, Defendants were deliberately indifferent to Ivan's serious medical risks and needs by, among other things, failing to provide Ivan with sufficient psychiatric care, providing Ivan with (or failing to confiscate from Ivan) the means to complete suicide (a plastic bag), and leaving Ivan unmonitored for at least forty-five minutes.

88.   By being deliberately indifferent to Ivan's serious medical risks and needs, Defendants violated Ivan's Fourteenth Amendment right to be free from such deliberate indifference as a pretrial detainee.

89.   As an actual and proximate cause of Defendants' deliberate indifference to Ivan's serious medical risks and needs, Ivan suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial.

90.     Defendants, moreover, acted (or failed to act) in deliberate and/or reckless disregard of Ivan's constitutionally protected rights.  Plaintiff thus seeks an award of exemplary damages against these defendants in an amount sufficient to punish this conduct and to deter such conduct in the future.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – *Monell*

### [By Ivan's Successor in Interest Against County]

91.     All prior paragraphs are incorporated herein by this reference.

92.     Ms. Palacios asserts this cause of action as Ivan's successor in interest.

93.     Ivan's Fourteenth Amendment rights were violated, and he suffered damages, as set forth in Plaintiff's First Cause of Action.

94.     Ivan's Fourteenth Amendment rights were violated as an actual and proximate result of the County's and the Department's: (a) deliberate indifference to the training needs of jail staff, including corrections and medical staff; and (b) a *de facto* customs, practices, and polices of (i) failing to coordinate and share critical medical information among jail staff; (ii)failing to conduct proper cell checks; (iii) failing to investigate misconduct, take appropriate remedial action, and covering up wrongdoing.

95.     Defendants County, Gore, Frierson, Chief Medical Officer, and Lee were, at the time of this incident, final policymakers for the County.

96.     By March 18, 2020, these final policymakers were well aware of the countless deaths and injuries from denial of medical care, including preventable suicides.

**A.     Deliberate Indifference to Training Needs Resulting in Constitutional Violations**

97.     These defendants and/or other currently unknown final policymakers for the County and the Department have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates to prevent the consistent and systemic failure to provide medical care, especially to those facing mental illness and suicidality.

COMPLAINT

**B.**   ***De Facto*** **Customs, Policies, and Practices Resulting in Constitutional Violations**

    **i.**    **Failure to Coordinate and Share Critical Medical Information Among Jail Staff**

98.    These final policymakers were well aware that jail staff were not properly documenting the chronic disease status of detainees, including major mental illnesses, and suicidality. Jail staff thus needed training or re-training. They were also aware the JIMS system was out-of-date and training on the system was inadequate to prevent the violation of detainees' constitutional rights.

99.    These final policymakers were well aware that there was a widespread pattern and long history of failure to communicate detainees/patients' critical medical history to other staff.

100.    Even after these final policymakers were provided with official reports from multiple organizations notifying them of these deficiencies and poor training, they failed to adequately train jail staff to address the problems noted by these reviewing organizations.

    **ii.**    **Failure to Conduct Proper Cell Checks**

101.    At the time of this incident, these final policymakers knew jail staff were conducting cell checks in a way that resulted in unnecessary harm and/or death to detainees.

102.    These final policymakers knew jail staff had lied in the past about conducting proper cell checks.

103.    These final policymakers knew jail staff had complained they had insufficient time to conduct proper cell checks.

104.    These final policymakers knew jail staff routinely failed to appropriately monitor individuals suffering from mental illness, including those who were suicidal.

    **iii.**    **Failure to Properly Investigate**

105.    At the time of this incident, these final policymakers had maintained, and

COMPLAINT

were continuing to maintain, a *de facto* policy of not properly investigating deaths of detainees in County jails.  These policymakers did so by leaving in place a woefully inadequate system (including CLERB) to determine whether detainee deaths were the result of a constitutional violation, whether such deaths were preventable, and whether such deaths could be prevented in the future.

106.   These final policymakers knew jail staff and Department personnel would wait months or years to report detainee deaths to CLERB, and that investigators were failing to obtain accurate and timely reports from witnesses and staff alleged to have been involved in misconduct or witnessed misconduct.  NCCHC found that the Jail was failing to conduct timely investigations of detainee deaths.

107.   Upon information and belief, these final policymakers knew jail staff and Department personnel (including investigators) to intimidate witnesses; ask leading questions, suggesting the answers; and summarize inmate interviews in a manner that distorted the actual recorded statements of witnesses.  These final policymakers allowed a pattern of keeping the truth from the families of inmates who die or suffer serious injuries in the County jails to persist.

108.   These final policymakers failed (and continue to fail) to adequately fund CLERB, properly staff CLERB, to properly train CLERB on how to conduct proper investigations.  They also allow summary dismissals of in-custody deaths without any investigation.

109.   These final policymakers failed (and continue to fail) to set up a mechanism to review the conduct of medical providers and staff in the County jails (regardless of the employment/contractor relationship between providers and the County and Department).

110.   Internal Affairs does not investigate medical or nursing misconduct.  The only "investigation" of misconduct of medical staff is through what defendants call "peer review."  After such peer review, the County then asserts privilege over the investigation materials, thereby shrouding the information and hiding the misconduct from the public.

111.   NCCHC found that there was no formal peer review process for contract

COMPLAINT

medical providers or for nurses, which means that there is no mechanism to independently investigate their misconduct.

112.   NCCHC found there was no way to keep track of detainee grievances related to medical care in detainee's medical files, and there is no way to sort or track the number of grievances related to the medical staff.

113.   NCCHC found that even when there was an investigation into a death of a detainee, practitioners were not told of the investigation results, making it impossible for the practitioners to learn from their mistakes.

114.   Because the County does not sufficiently fund or staff CLERB, it cannot complete investigations of the overwhelming number of deaths in the Jails.  Because culpable jail staff are not disciplined, it creates a culture in which the staff violate the constitutional rights of inmates and lie to cover it up without fear of discipline.  This leads to further mistreatment of detainees/patients.

115.   Instead of properly investigating the misconduct of jail staff, the County has focused its attention on preventing journalists from investigating deaths in the County jails to silence any criticism and public outcry.

116.   In those rare instances when CLERB makes a finding of fact and recommends action against jail staff, Gore and other final policymakers reject the recommendations.

117.   The longstanding pattern of failing to properly investigate staff misconduct led to the actions or inactions of the deputies and medical staff who denied proper medical care and observation to Ivan.  Defendants' pattern of failing to investigate created a culture of unconstitutional acts and acts that violate the Jail's own policies and procedures, including those policies related to cell checks.

C.   **County's *Monell* Liability**

118.   Ivan's Fourteenth Amendment rights were violated as an actual and proximate result of the County's and the Department's: (a) deliberate indifference to the training needs of jail staff, including corrections and medical staff; and (b) a *de facto*

COMPLAINT

customs, practices, and polices of (i) failing to coordinate and share critical medical information among jail staff; (ii)failing to conduct proper cell checks; (iii) failing to investigate misconduct, take appropriate remedial action, and covering up wrongdoing.

119. As an actual and proximate cause of the County's and the Department's deliberate indifference to training needs and the *de facto* customs, practices, and policies resulting in constitutional violations alleged herein, Ivan suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

**42 U.S.C. §§ 12101 et seq. – Violation of Americans with Disabilities Act**
**(By Ivan's Successor in Interest Against Currently Unknown Department**
**Personnel and County)**

120. All prior paragraphs are incorporated herein by this reference.

121. Ms. Palacios asserts this cause of action as Ivan's successor in interest.

122. On March 18, 2019, and at all times relevant to this complaint, Ivan had a disability as defined in 42 U.S.C. § 12102, in that he suffered from a mental impairment that substantially limited his neurological functions and other major life activities. Defendants were actually aware of Ivan's disability on March 18, 2019, including knowledge that Ivan was diagnosed with schizophrenia, had a history of suicidality, and was actively suicidal. At a minimum, Defendants perceived Ivan as suffering from such a disability.

123. On March 18, 2019, Defendants failed to provide reasonable accommodations to Ivan to avoid discrimination against Ivan on the basis of his actual and/or perceived disability. Defendants failed, in particular, to provide such reasonable accommodations to Ivan as (a) implementing and carrying out a chronic-disease protocol for severely mentally ill/suicidal detainees; (b) providing suicide-prevention training to jail staff, (c) providing Ivan and other actively suicidal detainees with prompt access to a mental-health provider, (d) diligently monitoring Ivan and other mentally ill/suicidal

24

COMPLAINT

detainees, and (e) ensuring Ivan and other suicidal detainees did not have the means (e.g., a plastic bag) to attempt suicide.

124.   As an actual and proximate cause of Defendants' failure to provide reasonable accommodations in light of Ivan's disability, Ivan suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial.

125.   Because Defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct.

**FOURTH CASE OF ACTION**

**Cal. Civ. Code §§ 51 & 52 – Violation of Unruh Civil Rights Act**

**(By Ivan Ortiz's Successor in Interest Against Currently Unknown Department Personnel and County)**

126.   All prior paragraphs are incorporated by this reference.

127.   Ms. Palacios asserts this cause of action as Ivan's successor in interest.

128.   On March 18, 2019, and at all times relevant to this complaint, Ivan suffered from a disability as defined by California Civil Code section 51(d)(1) and California Government Code section 12926(j) in that he suffered from a mental impairment that substantially limited his neurological functions and other major life activities.  Defendants were actually aware of Ivan's disability on March 18, 2019, including knowledge that Ivan was diagnosed with schizophrenia, had a history of suicidality, and was actively suicidal. At a minimum, Defendants perceived Ivan as suffering from such a disability.

129.   Defendants failed to provide reasonable accommodations to Ivan to avoid discrimination against Ivan on the basis of his actual and/or perceived disability. Defendants failed, in particular, to provide such reasonable accommodations to Ivan as (a) implementing and carrying out a chronic-disease protocol for severely mentally ill/suicidal detainees; (b) providing suicide-prevention training to jail staff, (c) providing Ivan and other actively suicidal detainees with prompt access to a mental-health provider, (d) diligently monitoring Ivan and other mentally ill/suicidal detainees, and (e) ensuring

25

COMPLAINT

Ivan and other suicidal detainees did not have the means (e.g., a plastic bag) to attempt suicide.

130.   Further, to the extent Ivan's rights under the ADA were violated, as set forth in the Third Cause of Action, Ivan's rights under the Unruh Civil Rights Act were also violated.  *See* Cal. Civ. Code § 51(f).

131.   As an actual and proximate cause of Defendants' failure to provide reasonable accommodations in light of Ivan's disability, Ivan suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial.

132.   Because Defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code section 815.2.

## FIFTH CAUSE OF ACTION

### Cal. Civ. Code §§ 54 et seq. – Violation of California Disabled Persons Act
### (By Ivan Ortiz's Successor in Interest Against Currently Unknown Department Personnel and County)

133.   All prior paragraphs are incorporated by this reference.

134.   Maria Palacios asserts this cause of action as Ivan's successor in interest.

135.   On March 18, 2019, and at all times relevant to this complaint, Ivan suffered from a disability as defined by California Civil Code section 54(a)(1) and California Government Code section 12926(j) in that he suffered from a mental impairment that substantially limited his neurological functions and other major life activities.  Defendants were actually aware of Ivan's disability on March 18, 2019, including knowledge that Ivan was diagnosed with schizophrenia, had a history of suicidality, and was actively suicidal. At a minimum, Defendants perceived Ivan as suffering from such a disability.

136.   Defendants failed to provide reasonable accommodations to Ivan to avoid discrimination against Ivan on the basis of his actual and/or perceived disability. Defendants failed, in particular, to provide such reasonable accommodations to Ivan as (a)

COMPLAINT

implementing and carrying out a chronic-disease protocol for severely mentally ill/suicidal detainees; (b) providing suicide-prevention training to jail staff, (c) providing Ivan and other actively suicidal detainees with prompt access to a mental-health provider, (d) diligently monitoring Ivan and other mentally ill/suicidal detainees, and (e) ensuring Ivan and other suicidal detainees did not have the means (e.g., a plastic bag) to attempt suicide..

137.   Further, to the extent Ivan's rights under the ADA were violated, as set forth in the Third Cause of Action, Ivan's rights under the California Disabled Persons Act were also violated. *See* Cal. Civ. Code § 54(c).

138.   As an actual and proximate cause of Defendants' failure to provide reasonable accommodations in light of Ivan's disability, Ivan suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial.

139.   Because Defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code section 815.2.

## SIXTH CAUSE OF ACTION

### Negligence

### (By Ivan Ortiz's Successor in Interest Against All Defendants)

140.   All prior paragraphs are incorporated herein by this reference.

141.   Ms. Palacios asserts this cause of action as Ivan's successor in interest.

142.   On March 18, 2019, Defendants had a duty to act with reasonable care and prudence in jailing individuals, especially in dealing with those suffering from mental illness and those who are suicidal.

143.   Defendants breached their duty of care by improperly, negligently, wrongfully, and recklessly failing to address Ivan's serious medical risks and needs.

144.   Defendants failed to sufficiently document Ivan's condition and communicate his condition to other jail staff.

COMPLAINT

145.   Defendants failed to provide the medical and psychiatric care to Ivan needed to address his serious medical risks and needs.

146.   Defendants failed to adequately surveil and monitor Ivan.

147.   Defendants failed to conduct adequate welfare checks of Ivan.

148.   Defendants failed to conduct adequate cell checks of Ivan.

149.   Defendants failed to set forth policies regarding proper screening, evaluation, treatment, and observation of inmates suffering from a serious medical condition or mental illness, including those who are suicidal.

150.   Defendants failed to implement and carry out a chronic disease protocol to address major mental illnesses.

151.   Defendants allowed their staff to violate rules and regulations with regard to conducting proper cell and welfare checks, whereby staff were failing to conduct proper cell checks even when an inmate had a history of suicide attempts and suicidal ideation.

152.   Defendants failed to train their subordinates on how to handle encounters with persons who have major mental illness, suicidal ideation, or another disability.

153.   Defendant failed to conduct adequate self-evaluation of procedures and training under the Americans with Disabilities Act about how to handle protocols for patients who suffer from major mental illnesses and suicidality.

154.   By engaging in the act alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Ivan.

155.   Moreover, to the extent that Defendants violated the Americans with Disabilities Act, the California Unruh Civil Rights Act, and/or the California Disabled Person Act, then the doctrine of negligence *per se* applies.  That is, these acts were enacted to protect individuals with disabilities, like Ivan.  A fact finder may, therefore, conclude Defendants' violation of these statues was negligence *per se*.

156.   As an actual and proximate cause of Defendants' negligence, Ivan suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial.

28

157.    Because Defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code section 815.2.

### SEVENTH CAUSE OF ACTION

**Negligent Hiring, Retention, & Supervision**

**(By Ivan Ortiz's Successor in Interest Against Gore, Frierson, Chief Medical Officer, Lee, Currently Unknown Department Personnel, and County)**

158.    All prior paragraphs are incorporated herein by this reference.

159.    Ms. Palacios asserts this cause of action as Ivan's successor in interest.

160.    On March 18, 2019, Gore, Frierson, Chief Medical Officer, Lee, and currently unknown Department supervisors had a duty to hire, retain, and supervise corrections staff and medical staff who were fit to perform their jobs as jail staff.

161.    The currently unknown department personnel who were responsible for, or substantially contributed to Ivan's death, were each unfit and/or incompetent to perform their respective duties as law enforcement officers, correctional staff, and/or medical staff. These individuals:

    a.   failed to properly document a serious medical condition;

    b.   failed to communicate to the other jail staff regarding the need to monitor;

    c.   failed to provide medical care of a serious medical condition;

    d.   failed to provide proper psychiatric care;

    e.   discriminated against, and failed to accommodate Ivan's disability, because of their perceptions of Ivan's disability and mental health;

    f.   failed to provide proper or enhanced surveillance and monitoring to Ivan;

    g.   failed to conduct proper welfare checks of Ivan;

    h.   failed to conduct proper cell checks of Ivan;

    i.   failed to render medical care to Ivan who was in obvious physical

29

COMPLAINT

and mental distress and in acute need of care; and

    j.  failed to screen, evaluate, treat, and observe inmates suffering from a serious medical condition or mental illness.

162.  Gore, Frierson, Chief Medical Officer, Lee, and currently unknown Department supervisors should have known, prior to this incident, that their subordinates were unfit and/or incompetent to perform their duties as jail staff.

163.  As an actual and proximate cause of these defendants' breach of their duty to exercise reasonable care in the hiring, retention, and supervision of their subordinates, Ivan suffered damages prior to his death, including those arising from his pre-death pain and suffering, in an amount to be proven at trial. Gore, Frierson, Chief Medical Officer, Lee, and currently unknown Department supervisors are therefore individually liable for this negligence.

164.  Because these defendants acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code section 815.2.

## EIGHTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Substantive Due Process

### (By Maria Palacios Against Currently Unknown Department Personnel)

165.  All prior paragraphs, except those alleging mere negligence under the Seventh and Eighth Causes of Action, are incorporated herein by this reference.

166.  On March 18, 2019, Defendants knew Ivan had a history of suicide attempts while in County jails, that Ivan had attempted suicide that morning, and that Ivan was actively suicidal, including hearing command hallucinations to hurt and kill himself.

167.  Defendants were not faced with rapidly evolving circumstances on March 18, 2019, in the sense that they needed to make split-second decisions. Rather, they had time to deliberate and decide on how they were going to address Ivan's serious medical risks and needs.

168.  Despites their knowledge of Ivan's serious medical risks and needs, and the

COMPLAINT

fact that they had time to adequately address these risks and needs, Defendants allowed Ivan to have a plastic bag and then left him unmonitored for at least forty-five minutes. This shocks the conscience.

169.   Ivan died as an actual and proximate result of Defendants' conscious-shocking conduct.

170.   As an actual and proximate result of Ivan's death, Ms. Palacios was deprived of her Fourteenth Amendment right as a parent to enjoy the familial companionship and society of her son.

171.   As a direct and foreseeable result of this denial of substantive due process, Plaintiff suffered economic and non-economic damages, in an amount to be determined at trial, including funeral expenses and loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

172.   Defendants, moreover, acted (or failed to act) in deliberate and/or reckless disregard of Plaintiff's constitutionally protected rights.  Plaintiff thus seeks an award of exemplary damages against these defendants in an amount sufficient to punish this conduct and to deter such conduct in the future.

## NINTH CAUSE OF ACTION

### Wrongful Death

### (By Maria Palacios Against All Defendants)

173.   All prior paragraphs are incorporated herein by this reference.

174.   At the time of his death, Ivan had no spouse or issue.  Thus, Plaintiff, as Ivan's parent, has standing to assert a cause of action for the wrongful death of Ivan. *See* Cal. Civ. Proc. Code § 377.60.

175.   As alleged herein, Ivan died as a result of each and every Defendants' tortious conduct.  Ivan's death was, therefore, wrongful for purposes of a claim for damages under California Code of Civil Procedure section 377.60.

176.   As a direct and foreseeable result of Ivan's wrongful death, Ms. Palacios suffered economic and non-economic damages, in an amount to be determined at trial,

COMPLAINT

including funeral expenses and loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

## TENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (By Maria Palacios Against Patron, Currently Unknown Department Personnel, and County)

177.   All prior paragraphs, except those alleging mere negligence under the Seventh and Eighth Causes of Action, are incorporated herein by this reference.

178.   On March 18, 2019, Defendants' conduct toward Ms. Palacios was extreme and outrageous, including Defendants' stonewalling and coldhearted treatment of Ms. Palacios as her son lay dying as a result of Defendants' reckless and deliberately indifferent conduct.

179.   Defendants intended to cause Ms. Palacios to suffer, and/or acted with reckless disregard of the probability that Ms. Palacios would suffer, emotional distress as a result of the way Defendants treated her while she was trying to get information and/or see her son after he was effectively allowed to attempt suicide.

180.   As an actual and proximate result of Defendants' outrageous conduct, Ms. Palacios suffered severe emotional distress.  Ms. Palacios thus seeks an award of damages to compensate for this distress in an amount to be determined at trial.

## VII.   PRAYER FOR RELIEF

181.   Pursuant to the foregoing causes of action, Plaintiff prays for the following relief:

    a.   on all causes of action, that judgment be rendered in favor of Plaintiff and against Defendants;

    b.   on all causes of action, that compensatory damages (including economic and noneconomic damages) be awarded as permitted by federal and state law, in amounts to be determined at trial;

    c.   on the First and Ninth Causes of Action, that punitive damages be

COMPLAINT

awarded against the individual defendants to these causes of action, as permitted by federal law, and in an amount sufficient to deter and make examples out of these individuals, to be determined at trial;

    d.    reasonable attorney fees, expenses, and costs of suit pursuant to 42 U.S.C. §§ 1988 and 12205; California Civil Code sections 52.1 et seq.; and California Code of Civil Procedure section 1021.5; and any other relevant statutory or case law; and

    e.    any and all other relief in law or equity to which Plaintiff may be entitled and which this Court deems just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the Constitution, Plaintiff hereby demands a trial by jury of this action.


Dated: March 10, 2020        SINGLETON LAW FIRM, APC

        By:   *s/Trenton G. Lamere*

        Trenton G. Lamere


Dated: March 10, 2020        HEPBURN, HERNANDEZ, & JUNG TRIAL ATTORNEYS

        By:   *s/Adam Hepburn*

        Adam Hepburn


        Attorneys for Plaintiff Maria Palacios

COMPLAINT